# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs April 14, 2015

## STATE OF TENNESSEE v. MICHAEL SMITH

**Appeal from the Criminal Court for Shelby County**
**No. 09-04071        James M. Lammey, Jr., Judge**

---

**No. W2014-00900-CCA-R3-CD  -  Filed October 21, 2015**

---

The defendant, Michael Smith, was convicted of aggravated burglary and sentenced as a Range II, multiple offender to ten years, the sentence to be served consecutively to a sentence previously imposed in another matter. On appeal, he argues that the evidence is insufficient to support his conviction and that the trial court erred by the following rulings:  (1) instructing as to flight; (2) concluding that the defendant could be impeached with prior convictions for rape and attempted rape; (3) engaging in an ex parte communication with the jury; (4) refusing to grant a mistrial; (5) concluding the defendant could receive a fair trial even though the State had lost or destroyed recordings of telephone calls and jail visits; and (6) not allowing the defendant to present certain proof to impeach one of the State's witnesses. Following our review, we conclude that the issues raised on appeal are without merit and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Lance R. Chism, Memphis, Tennessee (on appeal); Michael Smith, Pro Se (at trial), for the appellant, Michael Smith.

Herbert H. Slatery III, Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Paul Goodman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The relationship between the defendant and his former girlfriend, Kimberly Chrestman, who testified at both trials of this matter, has a history in the court system. In State v. Michael Smith, No. W2011-01630-CCA-R3-CD, 2013 WL 3702369, at *1

(Tenn. Crim. App. July 12, 2013), the first trial regarding the events, the defendant was convicted of aggravated burglary, a Class C felony, and assault, a Class A misdemeanor, and sentenced to an effective term of seven years. Next, in State v. Michael Smith, No. W2013-01190-CCA-R3-CD, 2014 WL 3954062, at *1 (Tenn. Crim. App. Aug. 13, 2014), perm. app. granted (Tenn. Dec. 18, 2014), he was convicted of aggravated assault of Ms. Chrestman for violating an order of protection and evading arrest and sentenced to ten years and eleven months, twenty-nine days, respectively. Finding that the defendant was a "dangerous offender," the trial court ordered that the sentences be served consecutively. Additionally, in Michael W. Smith v. Kimberly Chrestman, No. W2013-02478-COA-R3-CV, 2014 WL 1510420, at *1 (Tenn. Ct. App. Apr. 16, 2014), acting pro se, the defendant sued Ms. Chrestman for, allegedly, exposing him to Hepatitis C and stealing items from him. The trial court dismissed the complaint for lack of prosecution. We now proceed with our review of this matter.

## FACTS

This appeal is from the second time the defendant has been convicted of aggravated burglary, based upon the same set of facts. His first conviction was reversed by this court and remanded for a new trial after this court concluded that the trial court had erred by constructively amending the indictment in its charge to the jury. Michael Smith, 2013 WL 3702369, at *1. At the second trial, the defendant proceeded pro se and, again, was convicted.

Matthew Ronning testified that, at the time of the incident resulting in the indictment in this matter, he was living in a two-bedroom apartment, and a female acquaintance, Marris Orange, lived in the second bedroom. On February 9, 2009, Ms. Chrestman came to his apartment and said she wanted to stay "until it was light out and she could leave again." Ms. Orange also was present. In the early morning hours of the following day, Ms. Chrestman said she wanted to go to her mother's house in Mississippi, and Mr. Ronning agreed to drive her there. As they left the apartment together and went to his car, Mr. Ronning heard a scream and felt his "knee give out." He looked and saw the defendant as he kicked Mr. Ronning in the side of his knee, where two months earlier, he had knee replacement surgery. The defendant was aware of the knee replacement surgery. He then stabbed Mr. Ronning in the back with a screwdriver and tried to do so again, as Mr. Ronning held onto the defendant's hand grasping the screwdriver. He rolled under the car and tried to use his cell phone, which the defendant kicked. Mr. Ronning was able to call 911 and report that he was being attacked. Seeing that the defendant no longer was by the car, Mr. Ronning noticed his car keys, including the key to his apartment, were missing, and he then approached other apartments seeking help. He said he did not give the defendant permission to enter his apartment.

Gregory Hilliard testified that he was a detective in the Organized Crime Unit Project Safe Neighborhoods, of the Memphis Police Department. On February 10, 2009, he responded to an assault and burglary call at a location near Madison Avenue and Evergreen Street, near Zinnie's Restaurant. At the scene, they found Mr. Ronning bleeding from his head. Inside the apartment were two women, and officers saw that a bedroom door had been kicked in, and a bathroom window broken. While officers were at the scene, an ambulance arrived and transported the victim to the hospital.

Officer Michael Garner testified that he had been employed by the Memphis Police Department for nine years, and in February 2009 he was a detective assigned to the Investigative Support Unit. He said that on February 17 of that year, he and other officers went to an apartment at 1050 North Parkway in Memphis to transport the defendant to the Robbery Bureau. The defendant's father was in the apartment, and Officer Garner noticed the access to the attic was open. Officer Garner drew his pistol, looked into the attic, and saw the entrance to the next-door apartment was open. He then looked down into the second apartment, heard a door close, and dropped down into that apartment. The defendant was there and was handcuffed by another officer.

Kimberly Chrestman testified that the defendant was her former boyfriend. She said that, on February 9, 2009, after she and the defendant had argued at their apartment, she left to go to the apartment of Matthew Ronning. She saw the defendant "pop[] up in the window" of Mr. Ronning's apartment. The following morning, she was watching as Mr. Ronning, whom she called "Sonny," walked to his car, and he was attacked from behind by the defendant. She described the attack:

> I know that Sonny tried to get away from him by crawling underneath the car even. At one point [the defendant] got in the car and me and Mimi [Marris Orange] were standing back. And we see him doing this and of course he had something silver and shiny in his hand. We didn't know what it was. We thought he was killing him right there. We thought he was dead.

She saw Mr. Ronning screaming and banging on windows for help, as the defendant continued "beating on him." Soon, the defendant entered into the apartment, kicked open the door of the room she was in, and jerked her out by the hair. He then began beating and cursing her but ran away at the same time that Ms. Chrestman heard sirens.

The defendant presented one witness in his defense. Charles Beasley testified that he was acquainted with Matthew Ronning, Kimberly Chrestman, and the defendant. On February 9, 2009, he and "Shannon" went to Mr. Ronning's residence "to mak[e] sure

that [the defendant] wasn't around." Mr. Beasley did not see the defendant there. He said that Mr. Ronning, Ms. Chrestman, and Ms. Orange were smoking crack in the apartment. Following this testimony, the defendant rested his case.

## ANALYSIS

We will review the issues raised by the defendant on appeal.

### I. Sufficiency of the Evidence

The defendant argues that the evidence at trial is insufficient to sustain his conviction for aggravated burglary, asserting, specifically, that "no reasonable juror could have accredited the testimony given by Mr. Ronning and Ms. Chrestman since neither was a believable witness."

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting State v. Marable, 203 Tenn. 440, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'"

4

State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Aggravated burglary is defined as "burglary of a habitation." Tenn. Code Ann. § 39-14-403(a). As instructed to the jury, "[a] person commits burglary who, without the effective consent of the property owner . . . [e]nters a building and commits . . . a . . . assault." Tenn. Code Ann. § 39-14-402(a)(3). "Habitation" means "any structure, including buildings, module units, mobile homes, trailers, and tents, which is designed or adapted for the overnight accommodation of persons." Tenn. Code Ann. § 39-14-401(1)(A). "'Habitation' also includes garages and other outbuildings that are 'separately secured and occupied portions' of a habitation." Tenn. Code Ann. § 39-14-403, Sentencing Comm'n Cmts.

On appeal, the defendant points out a number of alleged discrepancies in the testimony of the State's witnesses at this trial, as well as their testimony during the first trial of this matter. As we have set out, it is for the jury to resolve any inconsistencies in the testimony of witnesses; and, we have no basis to reweigh or reevaluate the evidence in this matter. As for the defendant's assault upon Ms. Chrestman, the State's proof showed that, without permission, he entered the apartment through a locked door, broke through a bedroom door, grabbed Ms. Chrestman by the hair, and beat her as he pulled her toward the door. From this evidence, we conclude that a reasonable jury could have determined that the defendant illegally entered the apartment with the intent of assaulting Ms. Chrestman.

This assignment is without merit.

## II. Jury Instruction Regarding Flight

The defendant argues that the evidence did not warrant the trial court's instructing the jury as to flight. The State responds that the defendant's flight was circumstantial evidence of his guilt.

Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). An instruction will be considered prejudicially erroneous only if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)).

A flight instruction is warranted when "proof of 'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a

leaving of the community for parts unknown'" has been presented at trial. State v. Burns, 979 S.W.2d 276, 289-90 (Tenn. 1998) (quoting State v. Payton, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989)). The State can satisfy the subsequent hiding out, evasion, or concealment requirement by introducing evidence from which a jury might infer such action. State v. Terrance Wilks, No. W1999-00279-CCA-R3-CD, 1999 WL 1097832, at *4 (Tenn. Crim. App. Nov. 22, 1999) (citing Payton, 782 S.W.2d at 490; Rogers v. State, 2 Tenn. Crim. App. 491, 455 S.W.2d 182, 186-87 (Tenn. Crim. App. 1970)). "Any contradictory evidence that serves to rebut the [S]tate's proof merely raises a question for the jury to resolve." Id. (citing Hall v. State, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979)).

The trial court instructed the jury as follows regarding flight:

The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination.

The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

According to the State's evidence, the defendant twice fled – first, he stopped beating Ms. Chrestman and fled the apartment when police sirens could be heard and, second, several days later, when an attempt was made to arrest him. On the second

6

occasion, officers found in the defendant's father's apartment a ladder into an open attic door and a corresponding open attic door in the next-door apartment, where the defendant was found. We conclude that a reasonable jury could have determined that the defendant had twice fled.

In any event, even if it was error for the trial court to give the flight instruction, such error was harmless beyond a reasonable doubt. As noted by our supreme court in State v. Smith, 893 S.W.2d 908 (Tenn. 1994):

> Even if an instruction on flight should not have been given, any error is not reversible. The Court instructed the jury that whether the Defendant fled was a question solely for their decision, that they need not infer flight, and that flight alone was insufficient to prove guilt. This, coupled with the overwhelming proof of Defendant's guilt, renders any error as to the flight instruction harmless.

Id. at 918.

Just as in Smith, the trial court instructed the jury that whether the defendant fled was a question for its determination and that flight alone was not sufficient to find the defendant guilty. The instruction, read as a whole, and in light of the facts of this case, renders any error in giving the flight instruction harmless.

### III. Impeachment with Defendant's Prior Rape Convictions

The defendant argues that the trial court erred by ruling that he could be impeached with his prior convictions for rape and attempted rape. The State disputes this and responds that the opinion of this court regarding the defendant's first conviction for this offense concludes that the trial court, in that case, correctly determined that these convictions were admissible. Thus, in the State's view, the law of the case applies.

Following consideration of the State's motion to impeach the defendant with his prior felony convictions, applying Tennessee Rule of Evidence 609, the trial court explained why the defendant could be questioned regarding two of his prior felony convictions:

> The two prior rapes, however, they are felonies and within the ten years. I believe in the interest of justice that if the defendant were to testify, . . . the State should be allowed to ask him about these. It meets the requirements under the law. It's not the same charge that's on trial here.

7

So for those reasons I'm going to allow it. So those are the only two convictions, State, that you can ask about.

In two previous proceedings, this court concluded that, should the defendant testify, he could be impeached with these two convictions. In <u>Michael Smith</u>, 2013 WL 3702369, at *13, a panel of this court concluded that they were admissible because "they were probative of the defendant's credibility and not similar to the offenses for which he was on trial." Likewise, in <u>Michael Smith</u>, 2014 WL 3954062, at *15, a different panel of this court, reviewing the defendant's convictions for aggravated assault and evading arrest, concluded that, should he testify in that trial, he could be cross-examined regarding these same two prior convictions, as well as a 2011 conviction for aggravated burglary, saying that the trial court had not abused its discretion in determining that the defendant could be impeached with the convictions.

The "law of the case" doctrine applies to issues that were actually before the appellate court in the appeal and to issues that were necessarily decided by implication. <u>See</u> <u>State v. Jefferson</u>, 31 S.W.3d 558, 560-61 (Tenn. 2000) (citing <u>Memphis Publ'g Co. v. Tennessee Petroleum Underground Storage Tank Bd.</u>, 975 S.W.2d 303, 306 (Tenn. 1998)). When an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case which generally must be followed upon remand by the trial court, and by an appellate court if a second appeal is taken from the judgment of the trial court after remand. <u>Id.</u> The "law of the case" doctrine prohibits reconsideration of issues that have already been decided in a prior appeal of the same case. <u>Id.</u>

Accordingly, applying this doctrine with the holding of this court in the defendant's first trial of this matter, we conclude that the trial court did not err in determining that the defendant could be impeached with evidence of these two prior convictions.

## IV. Ex Parte Communication with Jury

While the jury was deliberating, the jurors sent to the judge a note, which said, "What happens if the jury is undecided about a charge?" On that note, the judge responded: "Keep working and do your best to come to an agreement. Re-read page 11." Later that day, the jury sent a second note, in which the phrase, "Assault – Bodily injury – do we have," was written and crossed out, followed by the question, "If we throw out the credibility of the witness, do we have a case?" To this, the trial judge responded in writing on the jurors' note, "I cannot comment on the credibility of witnesses. That is your job as a jury collectively and unanimously."

These communications later were discussed in court as the defendant, himself, argued that the trial court should recuse itself from the proceeding partly because of these ex parte questions and responses. The trial court declined the recusal request. On appeal, the defendant argues that, had he been brought into the courtroom before the court responded to the questions, the parties "would have been able to grasp the true meaning of the jury's question regarding the credibility of the witness," and he "would have been able to offer some helpful suggestions as to how best to handle the jury's question regarding the credibility of the witness."

The State responds that, while the trial court did not follow the proper procedure in responding to the jury questions, the defendant cannot show that he was prejudiced as a result.

We agree with the defendant that the jury's questions should have been addressed in open court in the presence of the parties. State v. Tune, 872 S.W.2d 922, 929 (Tenn. Crim. App. 1993). However, the failure to follow this procedure is subject to a harmless error analysis. Id. Reversal is normally not required unless the defendant has been prejudiced by an inappropriate response. Id.

In this matter, as to the first jury question, the trial court restated to the jurors their responsibility and directed that they reread page 11 of the charge. As to the second question, the court declined comment and, again, restated the responsibility of the jury. Given the nature of these questions, and the specific responses by the trial court, we cannot conclude that the defendant was prejudiced by the fact the judge responded to the questions out of the presence of the parties. Accordingly, this assignment is without merit.

## V. Denial of Request for Mistrial

On appeal, the defendant argues that the trial court should have granted a mistrial because of certain responses given by the witness, Kimberly Chrestman, as the defendant was cross-examining her. The State disagrees, as do we.

The defendant's first conviction resulting from this episode was reversed because of an error by the trial court. The other convictions resulted from his committing an aggravated assault upon Ms. Chrestman. Given all of this, it is not surprising that Ms. Chrestman was other than cooperative when being cross-examined by the defendant himself. During his cross-examination, the defendant was directed by the trial court not to stand so close to Ms. Chrestman, and, on another occasion, the State asked that he not do so. His cross-examination was long, tedious, and argumentative. The State made numerous objections to the form and relevance of the defendant's questions; and the

9

court, likewise, found a number of the questions irrelevant and instructed the defendant not to ask another question while the State still was objecting to his previous question. For instance, the defendant asked Ms. Chrestman why she did not tell the officers responding to the 911 call that he had assaulted her in the bedroom, and her answer, in part, was "[b]ecause this was an everyday occurrence with me and you." The defendant then objected to this answer, but the trial court agreed with the State that it was invited by his question. He asked if she had not posted bond for him after he was arrested and then objected to her response, "Michael, I've helped you post bond several times like a dummy." He asked if she had not talked with his previous lawyer, Javier Bailey, out of the defendant's presence and then objected to her explanation, "You were in prison."

Following other back and forth questions between the defendant and the witness, the trial court, out of the presence of the jury, assisted by the State, advised the witness to maintain her composure. At this point, the defendant asked for a mistrial based upon the responses of Ms. Chrestman, which the court denied, saying, "You can't cause a mistrial and then ask for one."

The decision of whether or not to declare a mistrial lies within the sound discretion of the trial court. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See Id.; State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999); Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527. This court will not disturb the trial court's decision unless there is an abuse of discretion. Id.

While the witness volunteered additional and sometimes non-responsive comments to the defendant's questioning, his irrelevant, confusing, and aggressive questions invited much of the information and opinions he objected to. We conclude that the trial court did not abuse its discretion in denying the defendant's request for a mistrial.

## VI. Lost or Destroyed Jail Records

The defendant complains the office of the Shelby Country District Attorney had a duty to require that the jail preserve recordings of the defendant's jail visits and telephone calls.

This matter appears to have first arisen following the defendant's previous counsel's filing, on January 21, 2014, a motion to dismiss based upon violation of due process and spoliation of evidence. These records were not sought until the eve of the defendant's second trial in this matter. According to the motion, "the State lost or failed to preserve audio/video recordings of jail visits and jail phone calls between [the defendant] and Kimberly Chrestman." On January 31, 2014, the trial court conducted a lengthy hearing on the motion. Witnesses testifying were Javier Bailey, a former attorney who represented the defendant at the first trial of this matter; Michaele Byers, the keeper of records for the Shelby County Jail; Juaquatta Harris, one of the keeper of records for telephone calls by inmates of the Shelby County Jail; and the defendant. The hearing proceeded on the defendant's claim that the charges should be dismissed because of the violation of his right to due process by the Shelby County Jail and the Shelby County District Attorney.

Following the hearing, the trial court made oral findings of facts and conclusions of law:

> There was nothing the state did to cause these records to be destroyed. They were never requested – the state was never requested to preserve this evidence. The state was not aware of this evidence until such time as defense counsel, on or about a week or so before trial, let it be known that he wanted these records. That's the first mention of any phone records.
>
> . . . .
>
> It's just like with the jail visitation. They would be glad to record the conversations, and, I suppose, the video of the visit, if they were specifically asked to do so beforehand. But here we have a situation where this was not discovery; this was never specifically asked for by the state – this is not Brady evidence. I mean, there's an allegation that it's Brady evidence. If, for instance – let's say the state had requested these the day that he went into jail; and then, lo and behold, there was all sorts of conversation where the victim said, "You know, I'm just going to lie on you – I'm going to go in there, and I'm just going to lie on you because I

11

want you to go to jail even though you're innocent;" and then they turned around and destroyed it. That's what this rule is for. That's what this evidence is for. That's what all this Ferguson analysis – that's what it's for – where they purposely destroy evidence – or they had exculpatory evidence and they willingly and maliciously allowed it to be destroyed. And that's not the case here. Here, defense counsel, based on his own initiative, didn't want to tip the state off to the fact that he was getting these records, so he waited until a week before trial; and a week before trial, he says they didn't have it; but he never subpoenaed them that I can see. There's no subpoena in the records that I can see. But I will say that these records are rather voluminous but I have flipped through them numerous times on all sorts of occasions for all sorts of reasons dealing with [the defendant], and I've never seen a subpoena for these records.

So, I don't think the state failed in its duty in any respect. In fact, as far as . . . I can tell from this – glean from this proof, whatever was contained in those phone records may have been more helpful to the state than not.

And furthermore, you know, it's just – I mean, he was enjoined from contacting the victim, and here he got under oath that on numerous occasions he called the victim from the jail. Holy mackerel. So, . . . each one of those is a violation of the court order – "Stay away and not have any contact" – each one. I don't remember any evidence that the restraining order was lifted. So, that's the danger, Mr. Smith, of insisting upon running your own show and insisting upon doing the things your way. I see nothing in what the state did to be faulty in this whatsoever. I think this was a mistake, perhaps, on behalf of the defense counsel, but the evidence is not there. You have the evidence the phone calls were made; and, I suppose, that's about as good as it's going to get. But I'm not going to dismiss this case based on Ferguson or based on any violation of discovery or Brady or for keeping exculpatory evidence away from the defense. I find it's just the opposite. So, I'm going to deny the motion to suppress.

In State v. Ferguson, 2 S.W.3d 912, 914 (Tenn. 1999), the Tennessee Supreme Court addressed the issue as to what factors guide the determination of the consequences that flow from the State's loss or destruction of evidence which the accused contends would be exculpatory. The supreme court answered that the critical inquiry was whether a trial, conducted without the destroyed evidence, would be fundamentally fair. Id. In reaching its decision, the Ferguson court noted that its inquiry was distinct from one under Brady v. Maryland, 373 U.S. 83, 87 (1963), and United States v. Agurs, 427 U.S.

12

97, 110-11 (1976), because those two cases addressed "plainly exculpatory" evidence, while Ferguson addressed a situation "wherein the existence of the destroyed videotape was known to the defense but where its true nature (exculpatory, inculpatory, or neutral) can never be determined." 2 S.W.3d at 915.

The court went on to explain that the first step in the analysis is determining whether the State had a duty to "preserve" the evidence. Id. at 917. "Generally speaking, the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id. (footnote omitted). However,

> "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

Id. (quoting California v. Trombetta, 467 U.S. 479, 488-89 (1984)). Only if the proof demonstrates the existence of a duty to preserve and further shows that the State has failed in that duty must a court turn to a balancing analysis involving consideration of the following factors: "1. The degree of negligence involved; 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and 3. The sufficiency of the other evidence used at trial to support the conviction." Id. (footnote omitted).

We note that the defendant did not request the jail telephone records or visitation records until two years after the incident, the eve of the first trial of this matter. Further, in the appeal which followed that trial, the defendant, then representing himself, did not raise as an issue the absence of these records. Only off-handedly in his cross-examination of Ms. Chrestman did the defendant question her about telephone calls, asking, after numerous questions which brought about in great detail his breaking into the apartment and beating her, that if her testimony were true, "Why would you be talking to me on the phone after this happened?" As the defendant continued with similar questions, the trial court advised the defendant that he was opening the door to proof that, while in jail after the assault, and in violation of a restraining order, he had made telephone calls to Ms. Chrestman.

Applying the considerations of Ferguson, we cannot conclude that the trial court erred in finding that the non-availability of these records prejudiced the defendant. As did this court in Brown, we note that, since the defendant waited until two years after the

offense to request the records, the State did not have a duty to retain them. As during the evidentiary hearing in that case, the defendant here did not testify as to the contents of the conversations or how they would have helped him. Further, the proof against the defendant was strong. Accordingly, we conclude that this assignment is without merit.

## VII.  Excluding Defense Testimony

The defendant argues that the trial court undermined his defense by excluding certain witness testimony. In his brief, he places the testimony into two categories: excluding proof of how "Ms. Chrestman acts while under the influence" and that "Mr. Ronning sold drugs to Ms. Chrestman on February 9, 2009." As to the first category, he argues that the court erred in excluding witness testimony that, when under the influence of drugs and/or alcohol, Ms. Chrestman acted "crazy" and like a "whackadoo," a term which remains undefined. Another excluded witness would have testified that, when under the influence, Ms. Chrestman was loud, belligerent, and erratic.

As to this testimony, the trial court ruled that it was inadmissible, explaining that "there's been no allegation that she was the aggressor here and that she attacked you and you were defending yourself. There's no evidence of that. So self-defense, her violent behavior is totally irrelevant. And none of these witnesses that I can see can testify to her truthfulness or untruthfulness." As for the defendant's proffer, the court further said, "[The State] has not gone into any other instances involving you two. But the door has already been opened. I'm surprised the State has not gone through it but it's been opened."

> And also, these witnesses would not have added anything. You had already got it in that she was a crack head thief. So her putting them on for purposes of asking them about her reputation for truth and veracity and also violent, I think it would have added nothing to the case and it would have opened the door to countless things and so I think under the circumstances, I had to get that on the record to show my reasoning for not allowing those two other witnesses to testify.

On appeal, the defendant presents a new theory as to why the trial court erred by not allowing his witnesses to testify regarding how Kimberly Chrestman "acts while under the influence." He acknowledges that he has changed his evidentiary theory since the trial regarding why this evidence was admissible, "Defendant recognizes that he framed this issue in a manner that focuses on the necessity defense. The more appropriate argument, however, is that [the witnesses'] testimony could have been used to further establish Ms. Chrestman's level of impairment in February 9-10, 2009." Since the defendant did not argue this evidentiary theory at trial, it is waived. Anticipating this

14

ruling, he next argues that we should review this issue as "plain error." We decline to do so, for such a review is not appropriate simply to enable a defendant to change evidentiary theories.

As his final argument, the defendant asserts that the trial court erred in not allowing the testimony of Charles Beasley "as to the fact that Matthew Ronning was providing the 'crack' cocaine to Ms. Chrestman, Defendant's girlfriend at the time, knowing she had cancer." In his pro se motion for new trial, the defendant did, in fact, make this argument. However, we have reviewed his jury-out questioning of Mr. Beasley, and the defendant neglected to ask the witness any questions in this regard. Thus, he is seeking an advisory opinion as to what he expects the trial court would have ruled on an issue that did not arise. This issue is without merit.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE

15